UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**23-60118-CR-RUIZ/STRAUSS**
CASE NO. _____

18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 1028A(a)(1)
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)

FILED BY ___KAN___ D.C.

**Jun 14, 2023**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

vs.

TERRONCE MORRIS and
BLAKE KELLY,

      Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1. J.B. was a famous music recording artist who performed at stadium concerts.

2. P.M was a famous music recording artist who performed at stadium concerts.

3. B.E. was a famous music recording artist who performed at stadium concerts.

4. Company 1 was a Florida corporation, created for the main purpose of producing, organizing, and promoting live stadium events, including concerts featuring music recording artists.

5. Company 2 was a New Jersey corporation.

6. Company 3 was a California corporation with a bank account in Woodland Hills, California.

7. J.R. was the president of Company 1 and Company 2, and resided in Parkland, Florida and Franklin Lakes, New Jersey.

8. Defendant **TERRONCE MORRIS** resided in Missouri City, Texas.

9. Defendant **BLAKE KELLY** resided in Los Angeles, California.

## COUNT 1
### Conspiracy to Commit Mail Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1. Paragraphs 1 through 9 of the General Allegations section of this Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

2. From in or around December 2019, and continuing through in or around March 2020, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**TERRONCE MORRIS and
BLAKE KELLY,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit the following offenses, namely:

(a) to knowingly and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly cause to be delivered certain mail matter by the United States Postal Service and by private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1341; and

(b)   to knowingly and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.   It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) fraudulently inducing J.R., Company 1, and Company 2 to provide money to the defendants based on materially false representations about the defendants' securing J.B., P.M., B.E., and other music recording artists to perform at a live music concert series, and (b) misappropriating the funds sent by J.R., Company 1, and Company 2 for the defendants' and their co-conspirators' personal use.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.   In or around December 2019, J.R.'s business associate introduced him to **TERRONCE MORRIS** and **BLAKE KELLY** via emails, text messages, and telephone calls. In those text messages, emails, and telephone calls, **MORRIS** claimed that he had extensive experience in securing music recording artists for stadium concerts, and that he had an existing professional relationship with J.B., who was a famous music recording artist. In those communications, **KELLY** claimed that he was intimate friends with J.B. and that, based on his

3

close relationship, he and **MORRIS** could secure J.B. to contract with **MORRIS** and J.R. to headline and perform at a live musical concert series in 2020.

5. In or around December 2019, **TERRONCE MORRIS** convinced J.R. to partner with him to purportedly produce a music festival series featuring J.B. and J.B.'s music recording artist friends. **MORRIS** and **BLAKE KELLY** falsely represented to J.R. that J.B.'s recording artist "friends" would join J.B. on separate nights of the festival, which was initially supposed to span three evenings.

6. In or around December 2019, **TERRONCE MORRIS** and **BLAKE KELLY** falsely represented to J.R. that, based on their close relationship with J.B., J.B. would reduce his fee for the series to $800,000 for the three-day event. **MORRIS** falsely stated to J.R. that because the event was somewhat of a gift from J.B. to **MORRIS** and **KELLY**, J.B. wanted all business to be handled directly through J.B, without J.B.'s management and talent agency participation.

7. In or around December 2019, **TERRONCE MORRIS** and **BLAKE KELLY** falsely stated to J.R. that J.B had agreed to perform at the concert series, and that he would also help secure other famous music recording artists to perform with him at the live stadium concert series. **MORRIS** told J.R. that in exchange for J.R. providing the funds to pay J.B. and the other performing artists, as well as well as the funds for other costs associated with producing the concert series, **MORRIS** and J.R. would split all ticket, merchandise, and concession profits from the concert series.

8. On or about December 18, 2019, J.R. received a teleconference "Facetime" call from **BLAKE KELLY** and someone that purported to be J.B. The teleconference call was purportedly to help ease any concerns J.R. had regarding the commitment of J.B. to participate in the concert series. **KELLY** introduced J.R. to the purported J.B. as the investor behind the concert

4

series, and after the brief introduction was made, the purported J.B. stated to J.R, "I am down, let's go, let's do this."

9. On or about December 19, 2019, **TERRONCE MORRIS** emailed J.R. a false and fraudulent contract for the concert series that contained **MORRIS'** electronic signature, as well as the forged electronic signature of J.B. According to the false and fraudulent contract, in exchange for $800,000, J.B. agreed to perform at the concert series.

10. On or about December 20, 2019, following **TERRONCE MORRIS'** instructions, J.R. purchased a $200,000 cashier's check payable to J.B, and mailed the check to **MORRIS'** residence located in Missouri City, Texas. **MORRIS** falsely told J.R. that the $200,000 was a partial payment to secure J.B.'s performance at the concert series. The $200,000 check, drawn upon an account in the name of Company 2 and payable to J.B., was subsequently endorsed by **MORRIS** and fraudulently deposited into **MORRIS'** personal checking account.

11. In or around January 2020, **TERRONCE MORRIS** discussed with J.R. that the initial location for the concert series, in Daytona Beach, Florida, did not have sufficient crowd capacity for an artist like J.B. Later that same month, **MORRIS** falsely told J.R. that **MORRIS** conferred with J.B. about the venue and that J.B. agreed to move the concert series to a larger stadium.

12. In or around February 2020, **TERRONCE MORRIS** told J.R. that **MORRIS** had prior experience with stadium concerts at the Alamodome in San Antonio, Texas. **MORRIS** convinced J.R. that J.B. would approve this venue because it was large and could seat 70,000. **MORRIS** and J.R. agreed that because the venue was much larger than the original stadium, the series should be reduced from three performances to two, and that J.B.'s compensation should be increased from $800,000 to $1,000,000.

13. In or around February 2020, J.R. personally met with **TERRONCE MORRIS** and **BLAKE KELLY** and discussed, among other things, finalizing the logistics of the concert series.

14. On or about February 14, 2020, **TERRONCE MORRIS** emailed J.R. a false and fraudulent contract for the concert series that contained **MORRIS'** electronic signature, as well as the forged electronic signature of J.B. According to the false and fraudulent contract, in exchange for $1,000,000, J.B. agreed to perform at the concert series for two shows at the Alamodome, San Antonio, Texas. In his email to J.R., which **MORRIS** also sent to **BLAKE KELLY, MORRIS** wrote, "Signed Contract ….It's Showtime Fellas!!!!!"

15. In or around February 2020, **TERRONCE MORRIS** falsely stated to J.R. that J.B had secured P.M. and B.E. to perform at the concert series, and that P.M. and B.E. each agreed to perform for a $500,000 fee.

16. In or around February 2020, **TERRONCE MORRIS** established a Gmail account to create the false and fraudulent impression that the email account belonged to J.B.

17. On or about February 26, 2020, **TERRONCE MORRIS** prepared an email from the false J.B. account with a subject line, "Here you go T and Blakey," and forwarded the email to another email account that **MORRIS** controlled. Along with the email, **MORRIS** attached a false and fraudulent contract for the concert series that contained **MORRIS'** electronic signature, as well as the forged electronic signature of B.E. According to the false and fraudulent contract, in exchange for $500,000, B.E. agreed to perform at the concert series for one show at the Alamodome, San Antonio, Texas.

18. On or about March 2, 2020, **TERRONCE MORRIS** forwarded to J.R. the February 26, 2020 email **MORRIS** had created, with the attached false and fraudulent B.E. contract. In the forwarded email to J.R., **MORRIS** wrote, "Its [sic] just [B.E.] contract in the

6

email forward from JB like you asked me . . . . You want me to send Post?"

19. On or about March 2, 2020, **TERRONCE MORRIS** emailed J.R. a false and fraudulent contract for the concert series that contained **MORRIS'** electronic signature, as well as the forged electronic signature of P.M. According to the false and fraudulent contract, in exchange for $500,000, P.M. agreed to perform at the concert series for one show at the Alamodome, San Antonio, Texas.

20. From in or around February 2020, and continuing through in or around March 2020, based on **TERRONCE MORRIS's** and **BLAKE KELLY's** false and fraudulent representations concerning the concert series, J.R., Company 1, and Company 2 sent **MORRIS** and his co-conspirators three bank wires in the amount of $150,000, $500,000, and $500,000. **MORRIS** and **KELLY** falsely represented to J.R. on several occasions that the money sent by J.R., Company 1, and Company 2 to **MORRIS** and his co-conspirators was specifically for securing the performances of J.B., B.E., and P.M. at the concert series.

21. On or about March 7, 2020, J.R. and Company 1 commissioned and caused the issuance of a press release for the concert series that was supposedly to take place on April 24, 2020 and April 25, 2020. The press release specifically mentioned J.B., P.M., and B.E. by name, as well as the Alamodome as the location for the concert series.

22. On or about March 9, 2020, a law firm representing J.B. and his management company sent a cease and desist letter that, among other things, informed J.R. and those individuals that J.R. hired to promote the concert series, that at no time had J.B. or anyone on his behalf agreed to perform at the concert series.

23. Of the $1,350,000 that J.R., Company 1, and Company 2 transferred to **TERRONCE MORRIS** and his co-conspirators for the purported performance fees of J.B., B.E.,

7

and P.M., **MORRIS** transferred approximately $237,000 to **BLAKE KELLY**. **KELLY** spent all the funds he received from **MORRIS** on personal expenses, including approximately $21,000 on travel and luxury lodging, approximately $44,000 in cash, and approximately $102,000 on food and luxury retail purchases. **MORRIS** likewise spent the funds that he received from J.R. on himself, including approximately $390,000 on travel and luxury lodging, and he withdrew approximately $260,000 in cash.

24. **TERRONCE MORRIS** and **BLAKE KELLY** and their co-conspirators made, and caused others to make, numerous materially false and fraudulent statements to J.R., Company 1, Company 2, and others, both orally and in writing, including, among other things, the following:

### Materially False Statements

(a) That J.B had contracted to perform at the concert series;

(b) That B.E. had contracted to perform at the concert series;

(c) That P.M. had contracted to perform at the concert series; and

(d) That the money J.R. provided to **MORRIS** would be used to contract with J.B., B.E., and P.M for the concert series.

25. **TERRONCE MORRIS** and **BLAKE KELLY** and their co-conspirators misappropriated approximately $1,350,000 of the fraudulently obtained funds for their personal use and benefit.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-4
### WIRE FRAUD
### (18 U.S.C. § 1343)

1. Paragraphs 1 through 9 of the General Allegations section of this Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

2.  From in or around December 2019, and continuing through in or around March 2020, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**TERRONCE MORRIS and**
**BLAKE KELLY,**

did knowingly, and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate and foreign commerce by means of wire communication, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.  It was a purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things: (a) fraudulently inducing J.R., Company 1, and Company 2 to provide money to the defendants based on materially false representations about the defendants' securing J.B., P.M., B.E., and other music recording artists to perform at a live music concert series, and (b) misappropriating the funds sent by J.R., Company 1, and Company 2 for the defendants' and their accomplices' personal use.

## THE SCHEME AND ARTIFICE

4.  Paragraphs 4 through 25 of the Manner and Means Section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## USE OF THE WIRES

5.  On or about the dates enumerated below, the defendants, for the purpose of

9

Case 0:23-cr-60118-RAR   Document 1   Entered on FLSD Docket 06/15/2023   Page 10 of 14

executing and in furtherance of the scheme and artifice to defraud, and to obtain money and property by means of materially and false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, did transmit and cause to be transmitted by wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, as more particularly described below:

| Count | Approximate Date of Wiring | Description of Wiring |
|---|---|---|
| 2 | 02/14/2020 | Email from **TERRONCE MORRIS** to J.R. and **BLAKE KELLY** via email address terroncemorris@me.com with subject line "J.B. San Antonio 2," attaching fraudulent contract with forged J.B signature. |
| 3 | 02/18/2020 | Wire transfer of approximately $150,000 from Company 1's account in Parkland, Florida to a bank account controlled by **TERRONCE MORRIS** in Missouri City, Texas. |
| 4 | 03/02/2020 | Wire transfer of approximately $500,000 from Company 1's account in Parkland, Florida to a bank account controlled by Company 3, in Woodland Hills, California. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 5
**Aggravated Identity Theft**
**(18 U.S.C. § 1028A(a)(1))**

On or about February 14, 2020, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**TERRONCE MORRIS and**
**BLAKE KELLY,**

during and in relation to a felony violation of Title 18, United States Code, Section 1343, that is, wire fraud, as charged in Count 2 of this Indictment, did knowingly transfer, possess, and use, without lawful authority, the means of identification of another person, that is, the name and

10

signature belonging to J.B., in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))

1. The allegations of this Indictment are by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **TERRONCE MORRIS** and **BLAKE KELLY**, have an interest.

2. Upon conviction of a violation of Title 18, United States Code, Sections 1341, 1343 and/or 1349, as alleged in this Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

ROGER CRUZ
ASSISTANT UNITED STATES ATTORNEY

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: _____

v.

TERRONCE MORRIS and
BLAKE KELLY,
_____/
     Defendants.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☒ FTL   ☐ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __7__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:
   (Check only one)      (Check only one)
   I   ☐ 0 to 5 days    ☐ Petty
   II   ☒ 6 to 10 days    ☐ Minor
   III   ☐ 11 to 20 days    ☐ Misdemeanor
   IV   ☐ 21 to 60 days    ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) _____
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) _____
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) _____
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? _____

By: _____
Roger Cruz
Assistant United States Attorney
FL Bar No.    157971

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** TERRONCE MORRIS

**Case No:** _____

Count #: 1

Conspiracy to Commit Mail Fraud and Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Term of Imprisonment:** 20 Years
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** 3 Years
* **Max. Fine:** $250,000 or twice the gross gain or gross loss from the offense

Counts #: 2-4

Wire Fraud

Title 18, United States Code, Section 1343
* **Max. Term of Imprisonment:** 20 Years
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** 3 Years
* **Max. Fine:** $250,000 or twice the gross gain or gross loss from the offense

Count #: 5

Aggravated Identity Theft

Title 18, United States Code, Section 1028(a)(1)
* **Max. Term of Imprisonment:** 2 Years (consecutive to any other sentence)
* **Mandatory Min. Term of Imprisonment (if applicable):** 2 Years
* **Max. Supervised Release:** 1 Year
* **Max. Fine:** $250,000 or not more than the greater of twice the gross gain or loss

\*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: BLAKE KELLY

Case No: _____

Count #: 1

Conspiracy to Commit Mail Fraud and Wire Fraud

Title 18, United States Code, Section 1349
* Max. Term of Imprisonment: 20 Years
* Mandatory Min. Term of Imprisonment (if applicable): N/A
* Max. Supervised Release: 3 Years
* Max. Fine: $250,000 or twice the gross gain or gross loss from the offense

Counts #: 2-4

Wire Fraud

Title 18, United States Code, Section 1343
* Max. Term of Imprisonment: 20 Years
* Mandatory Min. Term of Imprisonment (if applicable): N/A
* Max. Supervised Release: 3 Years
* Max. Fine: $250,000 or twice the gross gain or gross loss from the offense

Count #: 5

Aggravated Identity Theft

Title 18, United States Code, Section 1028(a)(1)
* Max. Term of Imprisonment: 2 Years (consecutive to any other sentence)
* Mandatory Min. Term of Imprisonment (if applicable): 2 Years
* Max. Supervised Release: 1 Year
* Max. Fine: $250,000 or not more than the greater of twice the gross gain or loss

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.